2016 IL App (3d) 130947

Opinion filed April 22, 2016

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2016

| | | |
|---|---|---|
| MERCY CRYSTAL LAKE HOSPITAL AND MEDICAL CENTER; MERCY HARVARD HOSPITAL, INC.; and MERCY ALLIANCE, INC., | ) ) ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiffs, | ) ) | |
| v. | ) ) | Appeal Nos. 3-13-0947 and 3-13-0960 |
| ILLINOIS HEALTH FACILITIES AND SERVICE REVIEW BOARD; DALE GLASSIE, in His Official Capacity as Chairman of the Illinois Health Facilities and Services Review Board; THE DEPARTMENT OF PUBLIC HEALTH; LAMAR HASBROUCK, in His Official Capacity as Acting Director; CENTEGRA HEALTH SYSTEM; CENTEGRA HOSPITAL-HUNTLEY, | ) ) ) ) ) ) ) ) ) ) ) ) | Circuit Nos. 12-MR-1824 and 12-MR-1840 |
| Defendants-Appellees | ) ) | |
| (Advocate Health and Hospitals Corporation, d/b/a Advocate Good Shepherd Hospital; Sherman Hospital; and Sherman Health System, | ) ) ) ) ) | |
| Defendants and Counterplaintiffs-Appellants). | ) ) ) ) ) | |

| | |
|---|---|
| MERCY CRYSTAL LAKE HOSPITAL AND MEDICAL CENTER, MERCY HARVARD HOSPITAL, INC. and MERCY ALLIANCE, INC., | ) ) ) ) ) |
| Plaintiffs-Appellants, | ) ) |
| v. | ) ) |
| ILLINOIS HEALTH FACITLITIES AND SERVICES REVIEW BOARD, DALE GLASSIE, in His Official Capacity as Chairman of the Illinois Health Facilities and Services Review Board; THE DEPARTMENT OF PUBLIC HEALTH; LAMAR HASBROUCK, in His Official Capacity as Acting Director of THE DEPARTMENT OF PUBLIC HEALTH; CENTEGRA HEALTH SYSTEM; CENTEGRA HOSPTIAL-HUNTLEY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants-Appellees | ) ) |
| (Advocate Health and Hospitals Corporation, d/b/a/ Advocate Good Shepherd Hospital; Sherman Hospital; and Sherman Health System, | ) ) ) ) ) |
| Defendants-Appellants). | ) ) Honorable ) Barbara Petrungaro ) Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justice Lytton specially concurred in the judgment, with opinion.
Justice Schmidt specially concurred in the judgment, with opinion.

**OPINION**

¶ 1    Centegra Hospital-Huntley and Centegra Health Systems (collectively "Centegra"), seeking to construct an acute care hospital in Huntley, Illinois, applied for a "certificate of need" permit from the Illinois Health Facilities and Services Review Board ("Board"). During the administrative process before the Board, Mercy Crystal Lake Hospital and Medical Center, Mercy Harvard Hospital, and Mercy Alliance (collectively "Mercy") and Advocate Health and Hospitals Corporation d/b/a Advocate Good Shepard Hospital, Sherman Hospital, and Sherman Health Systems (collectively "Advocate") were granted permission to intervene. Following a lengthy and complicated process, the Board approved Centegra's application. Mercy and Advocate sought administrative review in the circuit court of Will County, which ultimately upheld the Board's final administrative decision. The appeal followed.

¶ 2                                    FACTS

¶ 3    In 1974, the Illinois legislature enacted the Illinois Health Facilities Planning Act (Planning Act) (Ill. Rev. Stat. 1975, ch. 111 1/2, ¶¶ 1151 *et seq.*), which requires regulatory approval before any healthcare facility may be constructed or modified in Illinois. The legislature asserted that the purpose of the Planning Act was to "establish a procedure designed to reverse the trends of increasing costs of health care resulting from unnecessary construction or modification of health care facilities," and thereby to "improve the financial ability of the public to obtain necessary health services, and to establish an orderly and comprehensive health care delivery system which will guarantee the availability of quality health care to the general public." Ill. Rev. Stat. 1975, ch. 111 1/2, ¶ 1152.[1] The Planning Act provides for the creation of the

_____

[1] The Planning Act was amended in 2009. In the current version of the Planning Act, the legislature states that the Planning Act's objectives are: "to improve the financial ability of the public to obtain necessary health services; to establish an orderly and comprehensive health care

3

Board consisting of nine voting members appointed by the Governor with the advice and consent of the Senate. The Planning Act further provides that the Illinois Department of Public Health (IDPH) serves as administrative and staff support for the Board. 20 ILCS 3960/5 (West 2010).

¶ 4    On December 29, 2010, Centegra applied to the Board for a permit to build a 128-bed acute care hospital in southern McHenry County. Upon receipt of the application, the Board posted notice of an initial public hearing on Centergra's application on February 16, 2011, to be followed by further action at the Board's May 2011 meeting.

¶ 5    At the February public hearing, Centerga's chief executive officer testified that the proposed facility would fill a need for additional hospital beds for the surrounding community. The mayor of Huntley, members of the local fire and police departments, and several other community members spoke in favor of Centegra's application. Representatives of Advocate and others argued against Centegra's application. All told, 134 people spoke in favor of the application and 85 spoke in opposition.

¶ 6    Following the initial public hearing, the Board staff prepared a State Agency Report (SAR) that assessed Centegra's compliance with the general review criteria set out in relevant regulations. 77 Ill. Adm. Code § 1110 (amended at 3411. Reg. 6121 (eff. Apr. 13, 2010); 77 Ill.

delivery system that will guarantee the availability of quality health care to the general public; to maintain and improve the provision of essential health care services and increase the accessibility of those services to the medically underserved and indigent; to assure that the reduction and closure of health care services or facilities is performed in an orderly and timely manner, and that these actions are deemed to be in the best interests of the public; and to assess the financial burden to patients caused by unnecessary health care construction and modification." 20 ILCS 3960/2 (West 2010).

4

Adm. Code § 1120 (2010) (amended at 34 Ill. Reg. 6143, effective April 13, 2010). The SAR indicated that proposed project was in compliance with 17 of the 20 review criteria related to the establishment of a new hospital. However, the SAR also reported that the proposed project did not satisfy three review criteria: (1) planning area need, in that existing facilities in the relevant planning area were operating below capacity such that erecting a new facility would result in excess bed capacity in the area; (2) unnecessary duplication of service where existing facilities were not operating at full capacity; and (3) clinical services of other area providers would be adversely impacted, again due to a current underutilization of existing services.

¶ 7        On June 28, 2011, the Board held an open meeting to discuss Centegra's application, at which additional public comment was heard, and the SAR was placed in the record. At the conclusion of the public hearing, the Board voted to deny the application. Eight members voted to deny the application, while one voted to grant the application. In accordance with regulation, the Board sent a written notice of intent to deny the application to Centegra. The notice informed Centegra's of its right to place the matter on the Board's agenda at a future public meeting. Centegra exercised that right, following which the Board requested that Centegra provide certain additional information prior to the meeting: (1) a detailed response to the negative impact statements that had been submitted by Mercy and Advocate; (2) a detailed explanation as to how the proposed project would address the problems identified in a community impact study which had been conducted by the University of Illinois in 2010; and (3) a detailed response to the conclusion that decreasing population projections for McHenry County would negate the need for the proposed project. Centegra sent a written response to the request on July 28, 2011. The Board referred Centegra's response to its staff, which issued a revised SAR concluding that the application still failed to satisfy the three criteria.

5

¶ 8        On December 7, 2011, the Board conducted a public hearing at which it considered Centegra's application.  At that same hearing, it also considered an application filed by Mercy to build a hospital in the same service area.  Following consideration of the record and extensive public comment, the Board conducted a second vote on Centegra's application. This vote resulted in a tie vote – four members voting in favor of the application and four voting to deny the application.  Since the application did not receive a majority of five votes in favor, the application was again denied.  Centegra then requested a hearing before a hearing officer provided by IDPH.  Both Advocate and Mercy filed petitions to intervene in the administrative proceedings.  The hearing was scheduled to convene on March 22, 2012.

¶ 9        On March 16, 2012, the Board filed a request with the hearing officer seeking to return the matter to the Board for reconsideration.  Noting an "error in the record" the Board stated that a consultant report which should have been made part of the record in the Mercy application had been erroneously included in the record of the Centegra application.  The consultant report suggested that the Centegra application should be denied.  The Board reasoned that this report should not have been included in the Centegra record and requested that it be granted the opportunity to consider the application without reference to the erroneously included report.  On March 30, the IDPH hearing officer recommended that the Board reconsider Centegra's application with the corrected record.

¶ 10        On April 4, 2012, Centegra brought a *mandamus* action in the circuit court of McHenry County, seeking an injunction to prevent the remand of the case back to the Board.  Mercy and Advocate were named in the complaint as nominal defendants.  Following written and oral arguments, the circuit court determined that the hearing officer had authority to remand the matter to the Board to consider the application on the corrected record.  The court entered an

order denying Centegra's request for injunctive relief and the matter was remanded to the Board. Centegra filed a notice of interlocutory appeal. Subsequently, Centegra filed a motion to dismiss the interlocutory appeal with prejudice. The motion was unopposed. The appellate court granted the motion and dismissed the appeal. Centegra then moved to dismiss all counts in the McHenry County action. This motion was also unopposed. The court then dismissed, with prejudice, the challenges to the remand of the matter to the Board.[2]

¶ 11    On June 5, 2012, the Board held a public meeting at which Centegra's application was again considered. At this meeting, Mercy argued that if Centegra's application was going to be reconsidered, then its application, which had also been denied, should likewise be reconsidered. Advocate argued that the Board should take the formal step of correcting its record in the Centegra application, but that it did not need to vote again on the application. After considering the positions of all the interested parties and public comment, the Board voted to accept the hearing officer's recommendation to correct the record and to reconsider Centegra's application at its next regularly scheduled public meeting.

¶ 12    On July 24, 2012, the Board considered Centegra's application for a third time. In addition to public comment, both in favor and opposed to the project, Mercy sought to reintroduce the consultant report from its rejected application. Advocate argued that nothing

---

[2] In the instant appeal, appellants challenge the propriety of the remand to the Board. Under the doctrine of *res judicata* the dismissal of an action with prejudice constitutes a final adjudication on the merits that bars any subsequent action on that issue. *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008). Advocate, which is also Sherman's successor in interest herein, and Mercy were parties to the proceedings before the circuit court of McHenry County and are, therefore barred from raising this issue in this appeal.

7

changed since the Board's previous vote and urged the Board to again reject Centegra's application. For its part, Centegra noted that the three noncompliant criteria involved the alleged underutilization of existing health care facilities in the planning area and a projected lack of population growth for the relevant area. Centegra challenged the population projections and provided demographic analysis which actually projected significant population growth for the planning area and a corresponding increased need for a facility in accordance with the Centegra project. The Board then voted 6 to 3 to approve the project. A formal written approval was published on September 11, 2012.

¶ 13    On August 24, 2012, Mercy filed a complaint for administrative review in the circuit court of Will County.[3] Advocate filed its own complaint for administrative review four days later. On October 5, 2012, on motion by Centegra, the two complaints were consolidated. In July 2013, the court *sua sponte* determined that the Board's final order did not contain findings of fact or conclusions of law, and thus the court could not rule on the complaints for administrative review. The circuit court, citing *Medina Nursing Center, Inc. v. Health Facilities & Services Review Board*, 2013 IL App (4th) 120554, ¶ 27, remanded the matter to the Board "for further explanation."

¶ 14    On September 24, 2013, the Board held a fourth public hearing on the Centegra application. Following public comment, and arguments in favor and in opposition, the Board voted, by a vote of 7 to 1, to approve Centegra's application. The circuit court confirmed the Board's decision on November 8, 2013, finding that the Board had adequately articulated

---

[3] The meeting at which the Board approved Centegra's application was held in Bolingbook in Will County, thus venue was proper in Will County. 735 ILCS 5/3-104 (West 2012); *Slepika v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 16.

8

findings of fact and conclusions of law which provided a sufficient explanation for its decision. The court also found that the record supported the Board's decision. Advocate and Mercy then filed their respective notices of appeal. This court consolidated the two appeals.

¶ 15                                                   ANALYSIS

¶ 16                                           I. Standard of Review

¶ 17        On appeal, this court reviews the Board's final decision, not the decision of the circuit court. *MJ Ontario, Inc. v. Daley*, 371 Ill. App. 3d 140, 144 (2007). On review, an administrative agency's factual findings are considered to be *prima facie* true and correct and the reviewing court will not disturb those findings unless they are contrary to the manifest weight of the evidence. *Cathedral Rock of Granite City, Inc. v. Illinois Health Facilities Planning Board*, 308 Ill. App. 3d. 529, 542 (1999). While administrative factual findings are reviewed under a manifest weight standard of review, the ultimate decision of the administrative agency presents a mixed question of law and fact, requiring a reviewing court to examine "the legal effect of a given set of facts." *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). The clearly erroneous standard of review is significantly deferential, and, so long as the record contains evidence supporting the agency's decision, it should be affirmed. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992); *Provena Health v. Illinois Health Facilities Planning Board*, 382 Ill. App. 3d 34, 38-39 (2008).

¶ 18                              II. Sufficiency of the Board's Written Decision

¶ 19        On appeal, Advocate first maintains that the Board's written decision following remand from the circuit court of Will County was legally deficient. Specifically, it maintains that the Board failed to articulate with specificity its reasons for approving Centegra's application. Advocate's argument relies upon the holding in *Medina Nursing Center*, wherein the court

9

remanded a matter to the Board for "a reasoned opinion so as to make possible a meaningful judicial review." *Medina Nursing Center*, 2013 IL App (4th) 120554, ¶ 27. In *Medina*, the court found the Board's decision, which stated only that the Board had " '[c]onsidered the findings contained in the [SAR], the application material, and any testimony made before the [Board]' " to be insufficient for meaningful judicial review. *Id.*, at ¶ 17. Advocate argues that *Medina Nursing Center* established a standard or review for Board decisions which has not been met in the instant case. We disagree.

¶ 20        It is well settled that a reviewing court's role in an "administrative review action is to determine whether the evidence in the record supports" the agency's decision. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006). Courts generally do not inquire into the level of detail of the agency's decision. *Kimball Dawson, LLC v. City of Chicago Department of Zoning*, 369 Ill. App. 3d 780, 787 (2006). Where the testimony and documentary evidence is preserved in the record, a reviewing court has a sufficient factual basis upon which to determine whether an agency's decision is manifestly erroneous without the need for the agency to specify any factual basis for its decision. *Jagielnik v. Board of Trustees of the Police Pension Fund of the Village of Mundelein,* 271 Ill. App. 3d 869, 875 (1995) ("[u]pon administrative review, the function of both the trial and appellate courts is limited to determining whether the findings and conclusions of the administrative agency are against the manifest weight of the evidence" and "there need only be some competent evidence in the record to support its findings"). Moreover, our courts have held that the Board is not required to make specific written findings when it approves an application. *Charter Medical of Cook County, Inc. v. HCA Health Services of Midwest, Inc.*, 185 Ill. App. 3d 983, 991 (1989); *Access Center for Health, Ltd. v. Health Facilities Planning Board*, 283 Ill. App. 3d 227, 237 (1996) (Board

10

required to specify findings and conclusions only when it denies an application). To the extent that the court in *Medina Nursing Center* required the Board to articulate specific reasons for its decision on an application, we decline to follow the holding in that case. Instead, we turn to the issue of whether there is a sufficient factual basis in the record upon which to determine whether the Board's approval of Centegra's application was manifestly erroneous.

¶ 21                          III.  Review of the Board's Decision

¶ 22        The appellants argue that the Board's decision was clearly erroneous, which requires a showing that the opposite conclusion, *i.e.*, that Centegra's application should have been denied, was clearly apparent. *Provena Health*, 382 Ill. App. 3d at 47.  Specifically, they argue that the SAR finding that the application failed 3 of the 23 review criteria conclusively established that the application should have been denied. We disagree. Under the Board's rules and governing case law, an application does not have to comply with all review criteria. *Id.* at 40 (Board approval of application with seven negative criteria not clearly erroneous); *Cathedral Rock*, 308 Ill. App. 3d at 544 (approval with three negative criteria not clearly erroneous); *Access Center for Health*, 283 Ill. App. 3d at 236 (approval with three negative criteria not clearly erroneous). Moreover, our courts have also consistently rejected the argument that any criteria are more pertinent or important than any others. *Provena Health*, 382 Ill. App. 3d at 40.  Therefore, neither the number of negative criteria nor the relative importance of the particular negative criteria have any bearing on whether Board approval of an application was clearly erroneous.

¶ 23        We now turn to a discussion of whether the Board's decision was clearly erroneous. The record contains substantial evidence supporting the Board's decision to grant the application. In response to the circuit court's remand, the Board itemized the review criteria and found that Centegra had satisfied a majority of the criteria. Based upon population projections that the

11

Board found credible, it concluded that Centegra's project was necessary and would not lead to needless duplication or maldistribution of health care services. Moreover, the Board concluded that the noncompliant criteria "did not outweigh the positive aspects of the project."

¶ 24        The Board's findings of fact and conclusions of law stated the following: (1) Centegra met all the financial and economic criteria necessary to establish that it had sufficient financial resources to complete the project; (2) the need for medical, surgical, and intensive care beds was increasing in the planning area; (3) the application established that the relevant planning area was designated as a medically underserved population area and health manpower shortage areas; (4) the application adequately provided for cost containment, safety net and charitable care considerations; and (5) granting the application would not lead to an unnecessary duplication of services as the additional 128 beds proposed would "improve access to hospital services and create a more comprehensive and orderly health care delivery system in [the] planning area." The appellants challenge each of these findings and conclusions. However, it is well established that a reviewing court will not substitute its judgment for that of the Board. *Cathedral Rock*, 308 Ill. App. 3d at 545. Rather, we will defer to the Board's discretion, expertise and judgment in weighing and analyzing evidence regarding all statutory and regulatory criteria. *Charter Medical of Cook County*, 185 Ill. App. 3d at 988-89. Reviewing the record, we cannot say that there is no evidence contained therein to support the Board's findings and conclusions.

¶ 25                                        IV.  Arbitrary or Capricious

¶ 26        Appellants next maintain that the procedural history of Board's ruling on the Centegra application clearly demonstrates that its decision was both arbitrary and capricious and should be overturned on that basis. We disagree. Our courts have consistently ruled that an agency's actions will be considered arbitrary and capricious if the agency: (1) relied upon factors that the

12

legislature did not intend to be considered; (2) entirely failed to consider an important aspect of the application; or (3) offered an explanation for its decision that either runs counter to the evidence before it or is wholly implausible. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06 (1988); *Cathedral Rock*, 308 Ill. App. 3d at 543. In reviewing an agency decision for arbitrary or capricious analysis, we will not substitute our own reasoning for that of the agency. *Greer*, 122 Ill. 2d at 506.

¶ 27        Appellants maintain that the Board's rejection of the SAR recommendations establishes that its ultimate approval of Centegra's application was arbitrary and capricious. We must reject this claim. The Board is the ultimate factfinder and decision maker (*Highland Park Convalescent Center, Inc. v. Health Facilities Planning Board*, 217 Ill. App. 3d 1088, 1092 (1991)), and is required to consider staff findings, it is not bound to accept any findings or recommendations of its staff. *Cathedral Rock*, 308 Ill. App. 3d at 543. The mere fact that the Board did not accept and adopt the SAR in its entirety does not establish that the Board's ultimate decision was arbitrary and capricious.

¶ 28        Appellants also maintain that the Board's ultimate approval of Centegra's application was arbitrary and capricious since the evidence before the Board when it approved the application was the same as when it denied the application almost two years earlier. The record does not support this argument since there clearly was additional testimony presented at the two public hearings that occurred between the first Board vote and the last. Thus, there was additional evidence for the Board to consider when it revoted on the application. Moreover, as we have previously observed, the Board is the ultimate factfinder and we are aware of no authority that prevents an agency from reconsidering a previous decision. *Castaneda v. Illinois Human Rights Comm'n*, 132 Ill. 2d 304, 308 (1989) (agency allowed to fully deliberate prior to

13

issuing final and appealable decision).  Thus, the mere fact that the Board "changed its mind" during the three years in which it was considering the Centegra application does not, *a priori*, establish that the Board's ultimate decision either ran counter to the evidence before it or was wholly implausible.

¶ 29       Appellants further maintain that certain "procedural irregularities" in the application process establish that the Board's approval of Centegra's application was arbitrary and capricious.  Specifically, they claim that a letter sent by Centegra to the Board on September 10, 2013, was an improper *ex parte* communication which gave rise to an inference that the Board was acting in an imprudent and potentially improper manner.  We find this claim to be without merit.  An *ex parte* communication is one that occurs outside the presence or knowledge of one of the parties, and thus creates an inference of impropriety.  *In re Maher*, 314 Ill. App. 3d 1088, 1097-98 (2000).  Here, the letter at issue was sent to the Board and all the parties.  Therefore, no improper *ex parte* communication occurred.  Moreover, there is nothing in the record to indicate that the September 10, 2013, letter, which contained no new information, had any impact on the ultimate decision.  See *Kamelgard v. American College of Surgeons*, 385 Ill. App. 3d 675, 683 (2008) (an *ex parte* communication is improper where there is evidence to believe that decision was based on facts outside the record).

¶ 30       The appellants also maintain the Board engaged in prejudicial procedural irregularities when it did not allow written comments prior to the July 2012 vote.  Again, the record does not support their argument.  The Board not only allowed public comment at the July 2012 hearing, it also allowed any members of the public to submit written comments at various times prior to that hearing.  The Board's procedural limitations on submission of evidence were objectively

14

reasonable and cannot be seen as arbitrary or capricious. *Farmers State Bank of McNabb v. Department of Employment Security*, 216 Ill. App. 3d 633, 639 (1991).

¶ 31    Similarly, the appellants' argument that the Board's approval of the application was arbitrary and capricious due to alleged Open Meetings Act (5 ILCS 120/1 *et seq.* (West 2010)) violations is without merit. The appellants identify no facts showing a violation of the Open Meetings Act, and we can find none in the record. The record, to the contrary, established that the Board complied with the Open Meetings Act by voting in public before taking the final action at issue herein. 5 ILCS 120/2(e) (West 2010) ("[n]o final action may be taken at a closed meeting" and "[f]inal action shall be preceded by a public recital of the nature of the matter being considered and other information that will inform the public of the business being conducted").

¶ 32    V. Due Process

¶ 33    Appellants lastly maintain that the Board's approval of Centegra's application deprived them of due process. The starting point in any due process analysis is a determination of whether a life, liberty, or property interest exists that have been interfered with by State action. *Cathedral Rock*, 308 Ill. App. 3d at 539. Here, appellants claim that the Board deprived them of due process by failing to follow its own procedures regarding written comments, engaging in *ex parte* communications, failing to properly consider the weight of certain evidence, and violating the Open Meetings Act. As we found each of these contentions to be not supported by the record, the claim that the Board committed due process violations cannot be supported. Moreover, the mere fact that the Board approved a competitor's application, does not establish that a protectable right has been violated. *Id*. Therefore, we find no due process violation.

¶ 34    In closing, we offer a few words on the special concurrence. Justice Schmidt's offering brings to mind a timeless observation made in 1869 by American lawyer and poet John Godfrey

15

Sax, to wit: "Laws, like sausages, cease to inspire respect in proportion as we know how they are made." (Internal quotation marks omitted.) *An Impeachment Trial*, The Chronicle, Mar. 27, 1869, at 4.  By taking the public on a tour of the sausage factory in Springfield, Justice Schmidt risks triggering a collective case of indigestion.  On the other hand, Justice Schmidt may be this generation's Upton Sinclair.  A little dyspepsia might be a small price to pay for some much needed (and long overdue) transparancy.  After all, as Justice Brandeis so aptly put it, "[p]ublicity is justly commended as a remedy for social and industrial diseases.  Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."  Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 93 (1914).  We can only hope that the light that Justice Schmidt shines on the factory floor in Springfield leads to the production of more sanitary and wholesome sausages in the future.  For now, to paraphrase Captain Renault from *Casablanca*, we will merely note that we are shocked, *shocked* to find that political considerations are influencing the legislative process in Illinois.

¶ 35                                    CONCLUSION

¶ 36          For the foregoing reasons, the judgment of the circuit court of Will County confirming the final agency decision of the Board is affirmed.

¶ 37          Affirmed.

¶ 38          JUSTICE LYTTON, specially concurring.

¶ 39          I concur in the result.

¶ 40          JUSTICE SCHMIDT, specially concurring.

¶ 41          I concur in the majority's determination that the Board's approval of Centegra's application to construct an acute care hospital was not clearly erroneous, arbitrary and capricious, or a violation of due process.  I write separately in light of paragraph 3 (*supra* ¶ 3) of

16

the majority offering. No thinking person can accept the legislature's stated purpose, at least not after 1986.

¶ 42       The majority notes that the Illinois legislature enacted the Planning Act in 1974 in an effort to reverse the trend of increasing healthcare costs resulting from unnecessary construction or modification of healthcare facilities. 20 ILCS 3960/1 *et seq.* (West 2010). Let's assume that this was true at the time. That same year, the federal government developed what it termed the National Health Planning and Resources Development Act of 1974 (National Health Act), which required all states to adopt "Certificate of Need" (CON) programs in order to control both the growth of healthcare facilities and the increase/inflation of healthcare costs around the nation. Pub. L. No. 93-641, §§ 1, 3, 88 Stat. 2225, 2225, 2227 (1974). However, over the next several years, America's aggregate healthcare costs continued to rise, reaching $332 billion by 1982. Des Moines Register and Tribune, 10A (July 17, 1983). Realizing that its efforts had been a complete failure, Congress repealed the National Health Act in 1986. Drug Export Amendments Act of 1986, Pub. L. No. 99-660, § 701(a), 100 Stat. 3743, 3799 (1986). Despite the loss of federal support and proof that CON programs were not working, Illinois chose to retain the Planning Act.

¶ 43       Fast-forward to 2004, when the FTC and the DOJ released a joint report concluding that the anticompetitive risks associated with CON programs have thwarted any of their potential economic benefits. Department of Justice & Federal Trade Commission, Improving Health Care: A Dose of Competition, 22 (July 2004), available at http://www.justice.gov/sites/default/files/atr/legacy/2006/04/27/204694.pdf. In the course of their research, the FTC and the DOJ found that CON programs, such as the Planning Act, actually contribute to rising prices by inhibiting competitive markets that would be able to

17

control the costs of healthcare and guarantee quality and access to treatment and services. *Id.* at 4. In other words, the federal government came to the same conclusion that college professors across the country have been teaching freshmen in Economics 101 for years: a competitive market generally results in lower prices. As a result of their findings, the FTC and the DOJ recommended that states eliminate their CON programs. *Id.* 1, 22. Illinois, again, chose not to do so. Importantly, none of the studies mention the corruption costs built into the system. When people in the healthcare system and contractors are either donating to or buying politicians and/or Board members, it would be naïve to believe that those costs are not passed on to the consumer.

¶ 44 If the recommendation of the federal government and clear evidence of a failing program were not enough to convince the General Assembly that the Planning Act is counter-productive, consider the case of former Board member, Stuart Levine. Levine pled guilty in federal court to using his position on the Board to squeeze hospitals for kickbacks and campaign contributions for his friends. Levine managed to avoid an extensive prison sentence, but only after agreeing to testify against Tony Rezko—the wealthy Chicago businessman, who Levine testified controlled five of the nine Board members at the time. See *United States v. Rezko*, 776 F. Supp. 2d 651, 665-66 (N.D. Ill. 2011).

¶ 45 According to Levine, it was commonplace for the Board to give the go-ahead on construction only after either the hospital seeking application approval, or the contractor who sought to build the new hospital had bribed Rezko and made a political contribution to Rod Blagojevich's campaign. Former Board chairman, Thomas Beck, backed up Levine's claims. Beck testified under immunity from prosecution that with Rezko's support and a $1,000 donation to Blagojevich's campaign fund, he was appointed chairman of the Board. Two other Board

18

members donated $25,000 each to Blogojevich's campaign fund just 18 days before they were appointed to their positions on the Board. And these are just the people who got caught.

¶ 46   The application approval at the heart of the federal investigation? Mercy Crystal Lake. Levine testified at Rezko's trial that the Board approved Mercy's application to build a hospital in Crystal Lake only after Mercy's contractor, Joseph Kiferbaum, agreed to pay Levine and Rezko a kickback of approximately $1 million or more. *Id.* at 665. Of course, after the scandal erupted, the Board withdrew Mercy's application approval, paving the way for the case at hand.

¶ 47   Following the Rezko scandal, the Illinois legislature, at the expense of Illinois taxpayers, commissioned the Lewin Group to conduct a comprehensive evaluation of the Planning Act. The Lewin Group, An Evaluation of Illinois' Certificate of Need Program (Feb. 15, 2007), available at http:// ilga.gov/commission/cgfa2006/Upload/LewinGroupEvalCertOfNeed.pdf. Not so surprisingly, the Lewin Group determined that CON programs, in general, rarely reduce healthcare costs, and in some cases, actually increase prices by facilitating anticompetitive barriers to market entry. *Id.* at 16-17. Put another way, restricting new construction reduces price competition between facilities and actually keeps prices high. Without even considering the cost of political corruption, the Lewin Group concluded that it was "unrealistic" for Illinois to expect the Planning Act to reduce healthcare costs. The Lewin study explained that a totally free market could put inner city and rural "safety-net" hospitals at risk, but also found no evidence of greater inner city hospital failures in nonCON states as opposed to CON states. Lewin found no support for the argument that CONs provide a protective effect for safety-net hospitals' financial status.

¶ 48   Yet again, the Illinois General Assembly chose not to kill the goose that was laying golden eggs. To the contrary, the legislature doubled-down and expanded the definition of

"health care services" to include even more healthcare facilities. 20 ILCS 3960/3 (West Supp. 2009). This, of course, creates a whole new group of individuals and businesses who feel compelled to "donate" to secure favorable treatment by the Board.

¶ 49     Today, the Planning Act is still in effect, but with a slightly modified, but equally disingenuous stated purpose. 20 ILCS 3960/2 (West 2014).[4] This language would be funny were it not for evidence of the shameless political corruption in this state. The stated purpose of the Planning Act flies in the face of not only the FTC/DOJ study (*supra* ¶ 41), but also the study commissioned by the General Assembly at the expense of the taxpayers. Regardless, the ability of one to build or expand a healthcare facility in Illinois is still in the hands of nine individuals— Board members who have been appointed by the Governor and approved by the Senate. 20 ILCS 3960/4 (West 2014).

¶ 50     In essence and in fact, this legislation is nothing more than an additional corruption tax added to the cost of healthcare in Illinois. This legislation is clearly anticonsumer, but propolitician. Ironically, eradicating the Planning Act would fulfill the stated goal of the

---

[4] The current objectives of the Planning Act are: "to improve the financial ability of the public to obtain necessary health services; to establish an orderly and comprehensive health care delivery system that will guarantee the availability of quality health care to the general public; to maintain and improve the provision of essential health care services and increase the accessibility of those services to the medically underserved and indigent; to assure that the reduction and closure of health care services or facilities is performed in an orderly and timely manner, and that these actions are deemed to be in the best interests of the public; and to assess the financial burden to patients caused by unnecessary health care construction and modification." 20 ILCS 3960/2 (West 2014).

20

Planning Act. Yet, as the cost of healthcare continues to rise and Illinois remains the poster-child for political corruption, the General Assembly repeatedly refuses to do so. This legislation assures that money keeps pouring in to Illinois politicians not only from those wishing to build new hospitals, but also from incumbent hospitals wishing to avoid any competition. Each side wants their friends on the Board. This, of course, leads each side to "donate" to Illinois governors and senators. This is in addition to the history of bribes to Board members.

¶ 51    By restricting the output of healthcare services and diminishing incentives to pursue innovation, the Planning Act imposes significant and unnecessary costs on healthcare consumers, *i.e.*, the people of Illinois. As a result of this legislation, Centegra has been forced to jump through years of pointless hoops and incur untold unnecessary costs in order to build its hospital. Guess who ultimately incurs those costs. This is unacceptable. For these reasons, I specially concur in the judgment.